**EMBASSY GROUP, INC., Plaintiff and Appellant,**

v.

**T. Daryl and Maureen E. HATCH, Defendants and Appellees.**

No. 920427–CA.

Court of Appeals of Utah.

Dec. 7, 1993.

Heinz J. Mahler and Kirk G. Gibbs, Salt Lake City, for plaintiff and appellant.

Kent L. Christiansen, Salt Lake City, for defendants and appellees.

Before BILLINGS, DAVIS and GREENWOOD, JJ.

## OPINION

BILLINGS, Presiding Judge:

Plaintiff/appellant Embassy Group, Inc. appeals from a judgment denying its claims for breach of contract, fraud, mutual mistake, and unjust enrichment and quieting title to property in defendants/appellees Daryl and Maureen Hatch. We affirm.

## FACTS

This dispute centers on the purchase price of Lot 33 of Bridlewood Subdivision in Bountiful, Utah. Embassy argues that the asking price was $99,000, but that its predecessor accepted the Hatches' offer to purchase Lot 33 for $80,000. Daryl Hatch, on the other hand, contends he agreed to purchase Lot 33 for $40,000.

"We recite the facts in a light favorable to the decision of the fact finder." *Grahn v. Gregory*, 800 P.2d 320, 322 (Utah App.1990), *cert. denied*, 843 P.2d 516 (Utah 1991). In early 1986, Shim Investments, Embassy's predecessor in interest,[1] obtained three Bridlewood Subdivision lots totalling approximately two acres. At the time of acquisition, the property was valued at approximately $99,000. The three lots were subsequently combined into one lot known as Bridlewood Subdivision Lot 33. During the summer of 1986, Daryl Hatch negotiated the purchase of Lot 33 with Mark Wahlquist, Shim's agent. Wahlquist was employed by Granada, Inc., a real estate acquisition and development company.

Two standard Earnest Money Agreement and Offer to Purchase forms (Agreements), memorializing the arrangement between the parties, were introduced into evidence at trial. The first, signed only by Maureen Hatch and dated September 12, 1986, describes the property as "a portion of Bridlewood Subdivision Lot # 33 See exhibit A." No such exhibit was attached. The total purchase price is indicated as $40,000, with $100 as the earnest money deposit and $39,900 as the balance to be paid through a trust deed note. The second Agreement, bearing the same date, differs materially from the first only in its payment terms. The breakdown of the $40,000 purchase price is as follows: $100 as the earnest money deposit, $20,000 as the cash down payment at closing, and $19,900 as the balance to be paid "from the long term loan on the home to be built on the lot." Both Agreements contain two clauses relevant to the resolution of this dispute. With respect to the vesting of title, they provide, "Title shall vest in Buyer as follows: As specified at closing." Additionally, both contain an abrogation clause indicating, "Execution of a final real estate contract, if any, shall abrogate this Agreement."

Closing on the property occurred on November 25, 1986. Wahlquist directed the preparation of the closing documents. The Hatches paid the $20,000 down payment and executed a Trust Deed Note for $20,000 in which they promised to pay that amount upon obtaining long-term financing or on No-

---

1. Shim assigned to Embassy all of its claims against the Hatches.

vember 25, 1987, whichever came first. To secure the $20,000 indebtedness, the Hatches executed a Deed of Trust naming Associated Title Co. as the trustee for all of Lot 33. Keith Sorenson, Vice President of Granada, executed a Special Warranty Deed conveying all of Lot 33 to the Hatches for the sum of $10, which was held in escrow by Associated Title. After the closing, the Hatches proceeded to build a home on Lot 33.

In July 1987, the Hatches' lender paid the $20,000 Trust Deed Note. That same day, at Granada's behest, Associated Title transferred the Deed of Trust for all of Lot 33 to the Hatches.

Embassy later became the successor in interest to Shim Investments, retaining C. Dean Larsen as its president. Larsen contacted the Hatches requesting payment of $40,000, the amount he claimed they owed on the purchase of the lot. The Hatches refused, arguing they agreed to purchase the lot for $40,000 and had paid the full purchase price. Consequently, Embassy commenced this action seeking recovery for breach of contract, fraud, mutual mistake, and unjust enrichment.

At trial, Embassy's witnesses testified the arrangement intended by the parties was a two-step purchase of all of Lot 33 for $80,000. Wahlquist testified that the Agreements conveyed only a portion of Lot 33 for $40,000, and that this two-step purchase was arranged to accommodate the Hatches. The completed Agreements purportedly memorialized only the first portion of the arrangement. Larsen testified he approved the sale for $80,000.

Daryl Hatch denied any such two-step arrangement existed. He testified that he had agreed to purchase the entire lot for $40,000 and knew nothing of the $80,000 agreement described by Wahlquist. Maureen Hatch

testified that she was not involved with the negotiations and that she did not know of any terms or agreements other than those she and her husband signed.

The trial court found all of the witnesses credible. Nevertheless, the court concluded that Embassy had not met its burden of proof and denied all of its claims for relief. In its findings, the court focused on the closing documents to support its denial of relief:

7. All of the written documentation concerning the sale of Lot 33 to the Defendants indicates that the purchase price was $40,000.

. . . .

14. The Earnest Money Agreement and all of the loan and closing documents prepared by the Plaintiffs indicate that the purchase price of Lot 33 was $40,000.

Therefore, the court ordered legal and equitable title to Lot 33 to vest solely in the Hatches. This appeal followed.

Embassy argues that the trial court: (1) abused its discretion in failing to grant relief on Embassy's unjust enrichment claim based on the theory that there was no meeting of the minds as to the terms of the sale; (2) failed to make adequate findings of fact; and (3) made four findings of fact that are clearly erroneous.[2]

## STANDARD OF REVIEW

◼ If a trial court interprets the plain language of a written contract as a matter of law, "we accord its construction no particular weight and review its actions under a correction-of-error standard." *Buehner Block Co. v. UWC Assoc.*, 752 P.2d 892, 895 (Utah 1988). However,

if the contract is not an integration or is ambiguous and the trial court proceeds to

---

2. Because two of the challenged findings are not necessary to our affirmance, we do not reach them on appeal. However, Embassy also challenges the two findings recited above, numbers 7 and 14. Embassy's concern is that not all of the documents contain a purchase price. While that

may be technically true, that assertion does not render the findings clearly erroneous. The relevant closing documents that do contain a dollar figure reflect a purchase price of $40,000. Therefore, we reject Embassy's challenge to findings 7 and 14.

find facts respecting the intentions of the parties based on extrinsic evidence, then [the appellate court's] review is strictly limited ... "to review the evidence and all inferences that may be drawn therefrom in a light most supportive of the findings of the trier of fact."

*Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985) (quoting *Car Doctor, Inc. v. Belmont,* 635 P.2d 82, 83 (Utah 1981)).

■ In undertaking our review, we are also guided by the principle that this court may affirm a trial court's decision on any proper ground, even though the trial court may have premised its ruling on a different ground. *Buehner Block,* 752 P.2d at 895; *see also Branch v. Western Petroleum, Inc.,* 657 P.2d 267, 276 (Utah 1982); *Trimble Real Estate v. Monte Vista Ranch, Inc.,* 758 P.2d 451, 456 (Utah App.), *cert. denied,* 769 P.2d 819 (Utah 1988).

## I. THE DOCTRINE OF MERGER

The precise legal basis of the trial court's decision to vest title to all of Lot 33 in the Hatches is not clearly stated. However, the court's underlying findings of fact and the undisputed facts in the record allow us to affirm the court's decision based on the doctrine of merger.[3]

■ The Utah Supreme Court has explained the doctrine of merger as follows:

The doctrine of merger ... is applicable when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer. Execution and

delivery of a deed by the seller then usually constitute full performance on his [or her] part, and acceptance of the deed by the buyer manifests his [or her] acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement. Therefore, in such a case, the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable.

*Stubbs v. Hemmert,* 567 P.2d 168, 169 (Utah 1977) (footnotes omitted). In *Stubbs,* the seller's obligation was only to convey the property, and the buyer's acceptance of the deed constituted acceptance of the seller's performance "even though the estate conveyed may [have] differ[ed] from that promised in the antecedent agreement." *Id.*

The supreme court revisited the merger doctrine in *Secor v. Knight,* 716 P.2d 790 (Utah 1986). Relying largely on the *Stubbs* exposition of the doctrine, the court in *Secor* noted that merger may seem harsh but serves the purpose of "preserv[ing] the integrity of the final document of conveyance and encourag[ing] the diligence of the parties." *Id.* at 795. Underlying these expressions of the doctrine is the basic premise that

[o]rdinarily, a final contract does represent the final meeting of the minds, and in it are merged all the terms expressing the final intentions of the parties and any augmentations. If there are inconsistencies between the terms of the preliminary and final contracts, those of the latter will ordinarily govern.

*Mawhinney v. Jensen,* 120 Utah 142, 150, 232 P.2d 769, 774 (1951).

---

**3.** Embassy argues correctly that the findings of fact " 'should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached.' " *Acton v. J.B. Deliran,* 737 P.2d 996, 999 (Utah 1987) (quoting *Rucker v. Dalton,* 598 P.2d 1336, 1338 (Utah 1979)); *accord Sampson v. Richins,* 770 P.2d 998, 1002–03 (Utah App.), *cert. denied,* 776 P.2d 916 (Utah 1989) (explaining findings of fact must indicate mind of court and "resolve all issues of material fact necessary to justify the conclusions of law and judgment entered thereon").

Embassy bases this argument on Rule 52(a) of the Utah Rules of Civil Procedure. However,

under Rule 52(a), substantial compliance suffices; "the Rule is satisfied if, from the findings it (the trial court) makes, there can be no reasonable inference other than that it must have found against such allegations." *Parks v. Zions First Nat'l Bank,* 673 P.2d 590, 601 (Utah 1983). We conclude that the trial court substantially complied with Rule 52(a). Although the court did not use the magic word merger, the court clearly found controlling the unambiguous documents executed at closing and relied upon them to reject appellant's claims.

■ The merger doctrine has been routinely applied when an antecedent agreement contains an abrogation clause. For example, in applying merger in the *Secor* case, the court considered, inter alia, a clause providing that "execution of the final contract shall abrogate this Earnest Money Receipt and Offer to Purchase." *Secor*, 716 P.2d at 792. Furthermore, the supreme court has recognized that a deed is tantamount to a final real estate contract and usually abrogates a preliminary earnest money agreement containing an abrogation clause. *Espinoza v. Safeco Title Ins. Co.*, 598 P.2d 346, 348 (Utah 1979); *Kelsey v. Hansen*, 18 Utah 2d 226, 227, 419 P.2d 198, 198 (1966); *accord Stubbs*, 567 P.2d at 170 n. 4 (citing *Kelsey* for the proposition that an abrogation clause extinguishes the underlying agreement).

■ The two Agreements upon which Embassy relies contain abrogation clauses. The unambiguous language of the deed vests title in the Hatches for the consideration paid at the time of delivery. Under the general doctrine of merger, the trial court was correct in rejecting prior oral or written terms and enforcing the transfer of title reflected in the deed, "even though the estate conveyed may [have] differ[ed] from that promised in the antecedent agreement." *Stubbs*, 567 P.2d at 169.[4]

## II. EXCEPTIONS TO MERGER

■ The merger doctrine is not without its exceptions, which include fraud, mistake, and the existence of collateral rights in the contract of sale.[5] *Secor v. Knight*, 716 P.2d 790, 793 (Utah 1986). Ambiguity in the final contract may also warrant the introduction of parol evidence to remedy the ambiguity. *Verhoef v. Aston*, 740 P.2d 1342, 1344 (Utah App.1987). We consider each exception in turn.[6]

### A. Fraud

■ Proof of fraud militates against application of merger; "[h]owever, in order to prevail on a claim of fraud, all the elements of fraud must be established by clear and convincing evidence." *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986). The trial court found no factual basis for Embassy's claim of fraud. This court must give "due regard" to a trial court's determinations of credibility. Utah R.Civ.P. 52(a). Nothing in the record suggests the court's findings on fraud are clearly erroneous. Thus we conclude the fraud exception does not prevent the application of merger in this case.

### B. Mistake

■ Mistake also bars application of merger. However, not every mistake will suffice; rather, a mistake precludes merger when "one of the parties demonstrates a *mutual* mistake in the drafting of the contractual documents has occurred." *Grahn v. Gregory*, 800 P.2d 320, 327 n. 8 (Utah App. 1990), *cert. denied*, 843 P.2d 516 (Utah 1991) (emphasis added); *cf. Verhoef v. Aston*, 740 P.2d 1342, 1343–44 (Utah App.1987) (affirming trial court's refusal to reform uniform real estate contract or to award recovery when parties disagreed as to purpose of additional payment).

■ The Utah Supreme Court has required that "when a party denies merger due

---

4. The employees of Embassy's predecessor, as sellers, were experienced in real estate transactions, and they conveyed title to all of Lot 33 at their own risk.

5. In an earlier case, the supreme court mentioned exceptions for "inadvertence, ambiguity or fraud," each of which must be "clearly shown." *Mawhinney v. Jensen*, 120 Utah 142, 150, 232 P.2d 769, 774 (1951). In any of those instances, what was inadvertently added or omitted must be shown by clear and convincing evidence. *Id.*

6. We do not address the ambiguity issue in detail. The relevant ambiguity is ambiguity between the final document and other *contemporaneous* writings on the same subject. *Verhoef v. Aston*, 740 P.2d 1342, 1344 (Utah App.1987). In the instant case, the terms of the final conveyance are clearly and unambiguously reflected in the closing documents. There can be no question as to their meaning; they reflect the exchange of the entire Lot 33 for the sum of $40,-000.

to mistake, he [or she] has the burden to show mistake by *clear and convincing evidence."* *Neeley v. Kelsch,* 600 P.2d 979, 981 (Utah 1979). The party denying merger must demonstrate that (1) the instrument does not conform to the intent of both parties, (2) the claimant was mistaken as to the content of the instrument and the other party knew of the mistake but kept silent, or (3) the claimant was mistaken as to actual content due to "'fraudulent affirmative behavior.'" *Mabey v. Kay Peterson Constr. Co.,* 682 P.2d 287, 290 (Utah 1984) (quoting *Jensen v. Manila Corp. of the Church of Jesus Christ of Latter–Day–Saints,* 565 P.2d 63, 64–65 (Utah 1977)).

■ Our review of the record supports the trial court's finding that Embassy did not present clear and convincing proof that both parties intended a purchase price of $80,000 but mistakenly conveyed the entire lot for $40,000. The testimony of Embassy's witnesses that the purchase price was $80,000 was directly contradicted by the testimony of Daryl Hatch, whom the trial court found credible. Nor was there a showing that Embassy was mistaken and that the Hatches were aware of the mistake but kept silent about it. In fact, the trial court determined that Daryl Hatch was not aware that Embassy's predecessors believed the purchase price was $80,000. Finally, the trial court found no fraud, and by implication we conclude that fraudulent affirmative behavior was similarly lacking.[7]

### C. Collateral Rights

■ The collateral rights exception applies when the seller's performance involves some act collateral to the conveyance of title, with the result that those obligations "survive the deed and are not extinguished by it." *Stubbs v. Hemmert,* 567 P.2d 168, 169 (Utah 1977). Thus, when the contract of sale contains terms collateral to the conveyance of title, the deed cannot be said to be the intended performance of those terms, which necessarily survive after the conveyance. *Secor v. Knight,* 716 P.2d 790, 793 (Utah 1986).

■ Collateral terms may take various forms. For example, the supreme court found collateral terms to exist in *Stubbs,* where the earnest money and exchange agreement required the seller to remove certain equipment from the property at issue. The court held that the agreed-upon removal was collateral to the conveyance and hence that it survived the delivery of the deed; accordingly, the supreme court affirmed the trial court's admission of the earnest money agreement to prove the term. *Stubbs,* 567 P.2d at 170.

The supreme court has likewise defined those instances in which collateral rights are not implicated. Relevant to the instant case is the *Secor* court's conclusion that "covenants relating to title and encumbrances are not considered to be collateral because they relate to the same subject matter as the deed." *Secor,* 716 P.2d at 793. Applying merger, the *Secor* court held that the buyers were subject to restrictive covenants not present in the earnest money agreement but alluded to in the warranty deed, which referred to "restrictions of record." *Id.* at 792–94. In other words, because the restrictions related directly to title, they bound the buyers, despite the absence of those covenants in the merged earnest money agreement. *Id.*

■ In the present case, the disputed size and price of Lot 33 cannot be viewed as collateral because those terms relate directly to title and conveyance. The provisions for transfer of title were as follows: The Earnest Money Agreement stated that title would vest in the buyers as specified at closing, the Special Warranty Deed conveyed title to all

---

7. On appeal, Embassy attempts to circumvent its mutual mistake claim by arguing the trial court must have meant, and we should agree, that the parties had not reached a meeting of the minds. However, in its complaint and at trial, Embassy relied upon a mutual mistake claim which the trial court rejected. Furthermore, the closing documents and the parties' behavior in conformity with the terms of those documents for over three years belie the claim that the parties did not reach a meeting of the minds.

of Lot 33 to the Hatches, and the Deed of Trust named Associated Title as the trustee for the property pending the Hatches' payment of the remaining $20,000 obligation. Taken together, these documents provided that title to all of Lot 33 would vest in the Hatches upon their payment of the Trust Deed Note, which occurred in July 1987 and represented the final installment of the $40,000 purchase price. These terms are clearly central to the conveyance and cannot be viewed as collateral in any way. *See id.* at 793.

## III. CONCLUSION

Because we have found no exception that precludes application of the merger doctrine in the instant case, we therefore conclude that the conveyance at closing of all of Lot 33 for the sum of $40,000 represents the final merged agreement of the parties. Accordingly, we affirm the trial court's judgment vesting title to Lot 33 in the Hatches.[8]

DAVIS and GREENWOOD, JJ., concur.

---

8. Embassy further claims the trial court erred in refusing to grant relief for unjust enrichment, also commonly referred to as recovery in quantum meruit. Recovery under unjust enrichment "presupposes that no enforceable written or oral contract exists." *Davies v. Olson,* 746 P.2d 264, 268 (Utah App.1987); *accord Mann v. American W. Life Ins. Co.,* 586 P.2d 461, 465 (Utah 1978) (denying relief because express contract covered subject matter of litigation). Because we conclude that the deed and related documents constitute an enforceable contract, recovery for unjust enrichment is necessarily unavailable to Embassy, and the trial court correctly rejected the claim.